Filed 10/22/24  P. v. Crosby CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LORENZO CROSBY,<br><br>Defendant and Appellant. | F085458<br><br>(Super. Ct. No. MF014780A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Gregory A. Pulskamp, Judge.

Kaiya R. Pirolo, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

On December 5, 2021, defendant Lorenzo Crosby cut Devonte J.'s throat with a knife.  On July 14, 2022, defendant was found guilty of willful, deliberate, and premeditated attempted murder, as well as assault with a deadly weapon.  On

November 9, 2022, defendant was sentenced to a term of life with a minimum parole eligibility date of 14 years, plus eight years.

On appeal, defendant argues that: 1) there was insufficient evidence to support the premeditation and deliberation finding; 2) the trial court erred when it excluded Devonte's statements contained in his hospital medical records; 3) the trial court erred when it denied defendant's motions for release of juror identification information; 4) the trial court erred when it denied defendant's request to sentence him to the lower term on count 2 pursuant to Penal Code section 1170[1] because he experienced childhood trauma; and 5) the trial court erred when it denied defendant's request to strike all enhancements pursuant to section 1385. The People disagree.

We vacate defendant's sentence and remand for resentencing. In all other respects, we affirm.

## PROCEDURAL HISTORY

On June 30, 2022, the Kern County District Attorney filed a second amended information charging defendant with attempted murder (§§ 664, 187, subd. (a); count 1); and assault with a deadly weapon (§ 245, subd. (a)(1); count 2). As to count 1, the second amended information alleged that the attempted murder was willful, deliberate, and premeditated (§ 189). As to both counts, the second amended information alleged five aggravating factors that defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)), that defendant had a prior "strike" conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), and that defendant had suffered a prior serious felony conviction (§ 667, subd. (a)(1)).

On July 14, 2022, defendant was found guilty by a jury on both counts. The jury also found true that the attempted murder was willful, deliberate, and premeditated. Additionally, on both counts, the jury found true three aggravating factors and that defendant personally inflicted great bodily injury. In a bifurcated proceeding held on

---

[1]     All further undesignated statutory references are to the Penal Code.

July 15, 2022, the trial court found the prior strike allegation, the prior serious felony allegation, and the remaining two aggravating factors true on both counts.

On August 10, 2022, the trial court denied defendant's motion for release of jury identifying information.

On November 9, 2022, the trial court denied defendant's motion for a new trial, defendant's second motion for release of jury identifying information, defendant's request to strike all enhancements, and defendant's request for imposition of the lower term on count 2. The trial court also sentenced defendant. On count 1, the trial court imposed a term of life with a minimum parole eligibility date of 14 years (seven years, doubled due to the prior strike conviction), plus eight years (three years for the great bodily injury enhancement and five years for the prior serious felony conviction enhancement). As to count 2, the trial court sentenced defendant to six years (the middle term of three years, doubled due to the prior strike conviction), plus three years for the great bodily injury enhancement and five years for the prior serious felony conviction enhancement. The trial court stayed the sentence on count 2 pursuant to section 654.

On December 15, 2022, defendant timely filed a notice of appeal.

## FACTUAL SUMMARY

**The Prosecution's Case**

On the night of December 4, 2021, defendant, Devonte, Aiana M., Alma B., Devon D. (also known as Will), and others were hanging out at a park. Eventually, the group went into Alma's car to hangout because it was cold.[2] They were drinking, smoking marijuana, talking, and listening to music.

---

[2] According to Aiana, Alma, and Devonte, Alma was in the driver's seat and Devonte was in the front passenger seat. However, accounts diverged as to where the individuals in the back were sitting. At trial, Aiana testified that defendant was in the back driver side seat, she was in the middle of the back seat, and Devon was in the back passenger side seat. On the night of the incident, Aiana told officers that she was in the back driver side seat, Devon was in middle of the back seat, and defendant was in the back passenger side seat. According to Devonte, Devon was in the back driver side seat,

3.

At around 1:30 a.m. on December 5, 2021, defendant was getting ready to leave. Witness accounts diverged as to what happened next.

According to Aiana, defendant shook everyone's hand. Defendant reached over Aiana to shake Devonte's hand, and it looked to Aiana like he did. However, defendant actually cut Devonte's neck. There was blood everywhere as defendant left the car. Defendant was in his vehicle by the time Aiana and the others realized what had happened, and Aiana did not see a knife in defendant's hand.

After Aiana realized what happened, she got out of the car and followed defendant. She asked defendant why he did it. Defendant did not tell her why, but he did say "don't come up on me like that." On cross-examination, Aiana testified that defendant also said, "he knows why."

On redirect-examination, after having her memory refreshed by body camera footage of a statement she made to an officer, Aiana testified that she saw a knife in defendant's hand when he reached over. It was "a dark silver typical metallic color."

According to Devonte, defendant said goodbye to everyone. As defendant was getting out of the car, Devonte felt something go across his neck. He looked down and saw blood, which is how he knew his neck was cut. Devonte did not know why defendant attacked him.

According to Alma, Aiana and Devon had already left the car, and defendant was the last one in the backseat. Defendant hugged Alma and Devonte from behind, then left the car. As defendant went to hug Devonte, his hand went across Devonte's neck area. "[I]t took a second," then Devonte said he could feel something wet. Alma turned on the interior lights, and she saw blood leaking from Devonte's neck, as well as what looked like "white meat."

---

Aiana was in the middle of the back seat, and defendant was in the back passenger side seat. Alma did not remember where the individuals in the back were sitting.

After attacking Devonte, defendant went to his vehicle and left. Devonte's neck was bleeding badly. Alma was screaming and panicking. Clothing was placed and held on Devonte's neck to stop the bleeding.

Alma eventually called 911. Joshua Flores and Anthony Cabriales, police officers with the California City Police Department, responded to the call. Flores asked Devonte who stabbed him, and Devonte responded, "Lorenzo."

Devonte was subsequently transported to a hospital via ambulance. Devonte told medical professionals at the hospital what happened. Due to the amount of blood Devonte lost, he was given blood. Additionally, the wound was stitched and he had to have surgery.

**Defendant's Case**

Defendant introduced the following stipulation into evidence:

> "If called to testify, California City Police Department Sergeant Stewart would testify that on December 9, 2021 at 1:48 P.M., [Devonte] responded to the California City Police Department to be interviewed. Sergeant Stewart would testify … that [Devonte] stated that on December 5, 2021, he … was hanging out with friends in a vehicle that belonged to Alma …. [Devonte] was seated in the front passenger's seat and there were two females sitting in the backseat. He heard the females talking to a person later identified as [defendant], whom he identified as an acquaintance. [Defendant] entered the backseat of the vehicle and sat directly behind [Devonte]. [Devonte] was talking to [Alma] when without warning he felt something touch his throat and saw [defendant's] arm go back towards the backseat. He heard [defendant] exit the vehicle and walk to a nearby van, which [defendant] then entered and left the location. [Devonte] said he felt his neck get cold and began feeling dizzy."

## DISCUSSION

I. **Substantial Evidence Supports the Premeditation and Deliberation Finding and Defense Counsel Was Not Ineffective for Eliciting Inconsistent Testimony When Cross-Examining Aiana**

Defendant argues that there is insufficient evidence to support the premeditation and deliberation finding. Alternatively, defendant argues that if there is sufficient

evidence to support the finding because defense counsel elicited testimony from Aiana on cross-examination that defendant stated Devonte knew why defendant attacked him, then defense counsel rendered ineffective assistance. We reject both contentions.

### A. Applicable Law re: Premeditation and Deliberation

"The prosecution may seek a jury finding that an attempted murder was 'willful, deliberate, and premeditated' for purposes of sentence enhancement." (*People v. Smith* (2005) 37 Cal.4th 733, 740.)[3] " '[P]remeditation means " 'considered beforehand' " [citation] and deliberation means a " 'careful weighing of considerations in forming a course of action …' " [citation]. "The process of premeditation and deliberation does not require any extended period of time." [Citation.] " 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly ….' " ' " (*People v. Salazar* (2016) 63 Cal.4th 214, 245.). " ' " 'The true test is not the duration of time as much as it is the extent of the reflection.' " ' " (*People v. Watkins* (2012) 55 Cal.4th 999, 1026.)

"[T]hree types of evidence … indicate premeditation and deliberation. They are: '(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as "planning" activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so

---

[3]  "We do not distinguish between attempted murder and completed first degree murder for purposes of determining whether there is sufficient evidence of premeditation and deliberation." (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462, fn. 8, disapproved on another ground in *People v. Mesa* (2012) 54 Cal.4th 191, 199.)

particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).' " (*People v. Lenart* (2004) 32 Cal.4th 1107, 1127, quoting *People v. Anderson* (1968) 70 Cal.2d 15, 26–27.)[4]

However, these "categories of evidence … do not represent an exhaustive list of evidence that could sustain a finding of premeditation and deliberation, and the reviewing court need not accord them any particular weight." (*People v. Young* (2005) 34 Cal.4th 1149, 1183; see *People v. Lenart*, *supra*, 32 Cal.4th at p. 1127 ["The *Anderson* factors are not the exclusive means for establishing premeditation and deliberation"].) "The fundamental inquiry is whether … the crime occurred as a result of preexisting reflection rather than a rash or unconsidered impulse." (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1626; *People v. Pride* (1992) 3 Cal.4th 195, 247 ["*Anderson* was … intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse"].)

### B.     Standard of Review re:  Substantial Evidence

When evaluating a sufficiency of evidence claim, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)  "The test for evaluating a sufficiency of evidence claim is deferential." (*People v. Flores* (2020) 9 Cal.5th 371, 411.)  "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) "We must also 'accept logical inferences that the jury might have drawn from the

---

[4]     These three categories of evidence are sometimes referred to as the "*Anderson* factors."  (See, e.g., *People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

circumstantial evidence.' " (*Flores*, at p. 411.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*Cravens*, at p. 508.)

### C. Analysis re: Substantial Evidence

Defendant does not argue that there is insufficient evidence to support the finding that he attempted to kill Devonte. Instead, defendant argues that "there was insufficient evidence that [he] acted with premeditation or deliberation."

We disagree with defendant. While there is little to no evidence as to motive,[5] there is strong circumstantial evidence from which the jury could have reasonably concluded that defendant engaged in planning activity and that defendant attacked Devonte according to a preconceived design. There is testimony that defendant had the knife in the car, and there is no evidence suggesting that defendant came into possession of the knife while he was in the car. Accordingly, the jury could reasonably have inferred that defendant brought the knife into the car, which made it " 'reasonable to [have] infer[red] that he considered the possibility of homicide from the outset.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1250.) Additionally, there is testimony that defendant was seated in the backseat, behind Devonte. Defendant waited until he was about to leave the car, and he reached towards Devonte under the guise of saying goodbye. However, as he was doing so, he cut Devonte's throat. Finally, there is no evidence that, while defendant was in the car, something occurred that caused him to act on impulse.

---

[5] Defendant argues Aiana's testimony that she asked defendant why he did it, and defendant's response, "he knows why," does not indicate that defendant considered attacking Devonte in advance or that defendant conducted a careful weighing of considerations. We do not disagree, especially in light of Devonte's testimony that he did not know why defendant attacked him. However, as discussed in this opinion, other evidence amply supports the premeditation and deliberation finding.

Accordingly, substantial evidence supports a finding that the attempted murder "occurred as the result of preexisting reflection rather than unconsidered or rash impulse." (*People v. Pride*, *supra*, 3 Cal.4th at p. 247.)

Moreover, our Supreme Court has "concluded that an execution-style killing may be committed with such calculation that the manner of killing will support a jury finding of premeditation and deliberation, despite little or no evidence of planning and motive." (*People v. Lenart*, *supra*, 32 Cal.4th at p. 1127; see *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1269 ["Cases that have found sufficient evidence of premeditation and deliberation in the absence of planning or motive evidence are those in which '[t]he manner of the killing clearly suggests an execution-style murder.' "].)

And here, the jury could have reasonably found that defendant attempted to kill Devonte in a manner akin to "execution-style" because there is testimony that defendant cut Devonte's throat from behind under the guise of saying goodbye, and there is no evidence suggesting that Devonte struggled or fought back. (See, e.g., *People v. Stewart* (2004) 33 Cal.4th 425, 495 ["The killing was accomplished by a single execution-style shot fired from close range into the victim's forehead, in circumstances showing no evidence of a struggle."]; *People v. Romero* (2008) 44 Cal.4th 386, 401 ["[The victim] was killed by a single gunshot fired from a gun placed against his head. We have held that this execution-style manner of killing supports a finding of premeditation and deliberation when, as here, there is no indication of a struggle."]; *People v. Bloyd* (1987) 43 Cal.3d 333, 348 ["The manner of killing … was very strong evidence of deliberation and premeditation: The evidence described actions that were cold and calculated— execution-style killings, shots to the head while [Victim 1] was lying on her back and [Victim 2] was kneeling. [Victim 1] had been shot pointblank, while [Victim 2] was shot by a standing killer from a distance of one foot. Further, there was no evidence, such as bruises or lacerations, to demonstrate a struggle."].)

Based on the foregoing, defendant's argument that there was insufficient evidence to support the premeditation and deliberation finding fails.

### D.     Applicable Law re: Ineffective Assistance of Counsel

Defendant has the burden of proving ineffective assistance of counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) To establish such a claim, a defendant must show (1) his counsel's performance fell below an objective standard of reasonableness and (2) prejudice, that is, but for counsel's unprofessional error a different result would have been reasonably probable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.) "Because of the difficulties inherent in making the evaluation [of counsel's performance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Id*. at p. 689.)

"It is … particularly difficult to establish ineffective assistance of counsel on direct appeal, where we are limited to evaluating the appellate record. If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) Reversal is permitted " 'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there

simply could be no satisfactory explanation.' " (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.)[6]

### E.    Analysis re:  Ineffective Assistance of Counsel

We next turn to defendant's alternative argument that defense counsel provided ineffective assistance.

On direct-examination, Aiana testified that after defendant attacked Devonte, she got out of the car and followed defendant.  She asked defendant why he did it.  Defendant did not tell her why, but he did say "don't come up on me like that."  On cross-examination, defense counsel asked Aiana, "Do you recall telling law enforcement that when you came up to [defendant] and asked him why …[,] [defendant] told you he knows why?"  Aiana responded, "Yes, I do actually recall that."  Defense counsel pressed Aiana, "When you testified earlier, you gave a different statement?"  Aiana responded, "Well, it was two things but I didn't remember that one until you just said that and it came to me, yeah."  Defense counsel pressed further, asking "Did you tell law enforcement [about] the statement that [defendant] made about don't come up on me that way?"  Aiana responded, "No, I didn't."

Defendant argues that, if sufficient evidence supports the finding of deliberation and premeditation because defense counsel elicited this testimony from Aiana on cross-examination, then defense counsel rendered ineffective assistance.

First, as analyzed above, substantial evidence supports the finding of premeditation and deliberation even without this testimony from Aiana.

Second, defense counsel's performance did not fall below an objective standard of reasonableness.  "Although in extreme circumstances cross-examination may be deemed incompetent [citation], normally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must

---

[6]    Defendant argues ineffective assistance of counsel as an alternative argument several times.  For the sake of brevity, we include the relevant legal standards only once.

11.

make.  [Citation.]  'Even where defense counsel may have " 'elicit[ed] evidence more damaging to [the defendant] than the prosecutor was able to accomplish on direct' " [citation], we have been "reluctant to second-guess counsel" [citation] where a tactical choice of questions led to the damaging testimony.' "  (*People v. Cleveland* (2004) 32 Cal.4th 704, 746.)

Here, while there was risk in eliciting the statement and it may have ultimately been damaging to defendant, defense counsel had a rational tactical purpose for eliciting the testimony.  Defense counsel's theory of the case was that someone else attacked Devonte, and the three eyewitnesses knew who it was.  As these three witnesses identified defendant as the attacker, defense counsel reasonably (and repeatedly) attempted to elicit inconsistencies in the testimony of these witnesses.  This included the exchange described above, in which defense counsel reasonably pressed Aiana on the inconsistencies between what she told police and her testimony at trial.

Moreover, in eliciting the testimony, it appears that defense counsel was attempting to challenge Aiana's credibility in a second way.  According to Aiana, defendant stated that Devonte knew why defendant attacked him.  However, Devonte testified that he did not know why defendant attacked him.  Given this, defense counsel could rationally have intended to convince the jury that Aiana lied about or misremembered what defendant said.

Accordingly, defendant's ineffective assistance of counsel argument fails.

## II.    The Trial Court Did Not Err in Excluding Devonte's Purported Statement Contained in a Medical Record, and any Error Made by Defense Counsel was Harmless

### A.    *Additional Background*

On July 13, 2022 (after the prosecution's case-in-chief), the trial court held a hearing regarding the admissibility of a medical record that contained a prior inconsistent statement purportedly made by Devonte.  On cross-examination, defense counsel had asked Devonte if he "told medical professionals that [he was] seated in the passenger's

seat and the assailant came up to the window and sliced [his] neck?"  Devonte answered, "I don't remember."  Defense counsel also asked Devonte, "when you spoke to the medical professionals … you told them you did not know who attacked you?"  Devonte responded, "That's incorrect."

According to the medical record at issue, which was provided to the trial court by the prosecutor,[7] "PT CONFIRMED HE WAS SITTING IN THE PASSENGER SEAT OF A VEHICLE WHEN THE ASSAILANT CAME UP TO THE WINDOW AND SLICED HIS NECK WITH A LARGE SHARP KNIFE.  PT DENIED ANY OTHER INJURIES."

Defense counsel wanted to introduce this medical record as a prior inconsistent statement.  Defense counsel argued that there were two levels of hearsay, Devonte's out-of-court statement and the medical record documenting it.  The exception for the first level was that Devonte's out-of-court statement was inconsistent with his testimony at trial.  The exception for the second level was that the medical record was a business record of the hospital, in part because the declaration from the hospital's custodian of records indicated that the record was maintained in the regular course of business.

The trial court found the declaration from the hospital's custodian of records was not relevant because the record at issue was not created by the hospital.  Instead, it was "very clear" from the record that it was created by the ambulance company, and there was no declaration from the custodian of records at the ambulance company.

Additionally, there was "no sort of chain of sequence of events as to this particular statement."  That is, the statement attributed to defendant in the report could have come from a combination of people.  "One person might hear it from [Devonte], tell another person, tell another person, and it ends up in a report."  Accordingly, the trial court found that the statement attributed to Devonte was unreliable and excluded it pursuant to

---

[7]    The prosecutor only attached the first page of the six-page record, which contained the statement at issue.

Evidence Code section 352 because "it has the undue prejudice of risking confusion to the jury."

As defense counsel still believed the record was prepared by the hospital, the trial court allowed defense counsel to contact the custodian of records to determine whether the hospital prepared the record, and if it was prepared by the hospital, to bring that to the court's attention. Defense counsel later confirmed that she was not going to call the hospital's custodian of records as a witness.

That same day, the trial court provided additional explanation regarding its analysis. The court explained there were three levels of hearsay: Devonte's statement to the EMTs who transported him to the hospital, the EMTs relaying that information to the hospital, and the hospital relaying that information to the court (through the medical records it sent). The court also held there was a hearsay exception for Devonte's statement to the EMTs because it was a prior inconsistent statement.

However, the trial court further held that there was no hearsay exception for the other levels. There was no evidence that the EMTs' records qualified as business records. And even if the hospital's records qualified as business records, Devonte's "statements probably don't qualify." The multiple layers of hearsay called into question the authenticity of Devonte's statement. The court also again noted that "there may be even more layers that we're not even aware of the way it's written there because we're not sure who heard what and who transferred onto who." Devonte's statement "just ended up in some record," which was not sufficient.

On November 9, 2022, when ruling on defendant's motion for a new trial,[8] the trial court again addressed the admissibility of statement attributed to Devonte in the medical record. The court noted it previously excluded the statement, stated that it stood by its ruling, and provided clarification regarding the ruling. In clarifying its ruling, the

---

[8] Defendant does not make any claims of error based upon the trial court's ruling on his motion for a new trial.

court held that one reason the statement in the medical record did not qualify for the business record hearsay exception is that "the ambulance drivers didn't personally observe what went on that day and they had no duty to record what went on that day."

### B.    Applicable Law

"Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if:  [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."  (Evid. Code, § 1271.)  "It is the burden of the party offering the evidence to establish that these foundational requirements have been met."  (*People v. McVey* (2018) 24 Cal.App.5th 405, 414.)

### C.    Standard of Review

"A trial court has broad discretion in determining whether a sufficient foundation has been laid to qualify evidence as a business record.  On appeal, we will reverse a trial court's ruling on such a foundational question only if the court clearly abused its discretion."  (*People v. Hovarter* (2008) 44 Cal.4th 983, 1011.)  This "is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review.  The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious."  (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted.)

Even if a trial court abuses its discretion, "[s]tate law error in the admission of hearsay requires reversal of the judgment [only] if ' "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the

15.

error." ' " (*People v. Turner* (2020) 10 Cal.5th 786, 823, quoting *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*).)

### D. Analysis

Defendant makes multiple claims of error regarding the admission of medical records. We address each argument in turn.

Defendant argues that substantial evidence does not support the trial court's finding that the medical record at issue was created by the ambulance company and not the hospital. According to defendant, in making its finding, the trial court erroneously "rel[ied] on its own outside knowledge instead of the evidence contained within the hospital records and the custodian of record's declaration."

This argument is unpersuasive. As the trial court noted, "at the very top [the record] says 'emergency medical transport.' " Near the top, the record also states that it is a "Prehospital Care Report." In addition to this, the narrative section of the report appears to have been prepared by an individual working in the ambulance, not by hospital staff. Among other things, the narrative states that Devonte was "FOUND STANDING UPRIGHT." It also states that Devonte was "PLACED ON GURNEY, STRAPPED IN AND LOADED FOR A PRIORITY 1 TRANSPORT TO [HOSPITAL]." Given this evidence and the deferential substantial evidence standard (*People v. Flores*, *supra*, 9 Cal.5th at p. 411), the trial court did not abuse its discretion when it found that the medical record was created by the ambulance company.[9]

Defendant argues, in the alternative, that defense counsel provided ineffective assistance because the trial court only had one page of the six-page record, and defense counsel did not provide the court with the remaining five pages. According to defendant, had the court reviewed the additional five pages, it is reasonably probable that it would have admitted the medical record.

---

[9] As we conclude the trial court did not err in excluding the record on this ground, we do not address the court's other grounds for excluding the record.

16.

Defendant is correct that the six-page medical record does address some of the trial court's concerns regarding admissibility of the record. However, it also supports the court's finding that the record was prepared by employees of the ambulance company, not the hospital. The record includes various entries supporting that finding, including when the "unit" was dispatched, was enroute, was at the scene, and when it arrived. Moreover, according to the record, it was signed by the EMTs who responded to the scene in the ambulance.

As providing the full record to the trial court would have only reinforced its finding that the record was prepared by employees of the ambulance company, defense counsel could have reasonably concluded there was no reason to introduce the remainder of the record. For this same reason, even if defense counsel was ineffective, defendant was not prejudiced.

Next, defendant argues that, even if the record was prepared by the ambulance company, the trial court still erred because the record was admissible, not as "independent proof of the facts," but to impeach Devonte. In support of this argument, defendant relies on *Rosener v. Larson* (1967) 255 Cal.App.2d 871 and *Springer v. Reimers* (1970) 4 Cal.App.3d 325. However, both cases are readily distinguishable. Both addressed the admissibility of medical records when an expert relies on those records in forming their opinion. (*Rosener*, at pp. 877–878; *Springer*, at p. 338.) Neither addressed whether a prior inconsistent statement contained in a medical record could be used to impeach a lay witness. Accordingly, this argument is also unpersuasive. Moreover, even if the record should have been admitted solely to impeach Devonte and not for the truth of the statement included therein, its evidentiary value would be severely diminished and any error was harmless for the same reasons described below.

Finally, defendant argues that defense counsel's performance was deficient because she failed to introduce a second medical record that would have impeached Devonte's testimony. This record included the name of the hospital at the top, and it was

17.

signed and dated by an emergency department doctor. According to this record, "DEVONTE … is a 23 Years [*sic*] Male who was brought in after being attack [*sic*] by an unknown individual just prior to arrival. He was single [*sic*] by to [*sic*] his friends when he was suddenly accosted from behind and felt a sharp/across his neck." The record also stated, "[p]atient states that they do not know the assailant."

Defendant argues that defense counsel should have introduced this record to impeach Devonte because "[t]here were no issues of authenticity or jury confusion and the two levels of hearsay each had an exception: [Devonte's] statement was a prior inconsistent statement and it was made directly to the doctor so it clearly fell within the business records exception." Defendant further argues that there was no tactical reason not to introduce this record. Instead, "[i]t is apparent that defense counsel simply was unaware that another page of the hospital records contained a prior inconsistent statement that she could use to impeach [Devonte]."

Defendant argues that this (and the other) errors were prejudicial. According to defendant, the testimony of Aiana, Devonte, and Alma was "full of inconsistencies about who was present in the car, where everyone was seated, and who was present at the scene in general." Additionally, "some of the jurors were not initially convinced that [defendant] was [Devonte's] assailant." Accordingly, Devonte's "statement contained in the ambulance narrative would have damaged his credibility," as well as the credibility of Aiana and Alma, and thus "could have caused at least one of the jurors to hold fast to their belief that the witnesses were lying."

Even assuming that defendant is correct and defense counsel's performance was deficient because she did not introduce the second medical record, given the weight of the evidence, defendant suffered no prejudice.

Multiple witnesses testified that, after the incident, Alma called 911. A copy of the 911 call was introduced into evidence, and it supports the testimony that Alma was screaming and panicking. Flores, a police officer, testified that he arrived at the scene

approximately three minutes after being dispatched. Flores further testified that he asked Devonte who stabbed him, and Devonte responded, "Lorenzo." Moreover, according to Flores, Aiana and Alma also provided a statement to the officers regarding what occurred. Given Alma's panic and how quickly officers arrived, defendant's theory of the case, that Aiana, Alma, and Devonte agreed to lie and blame Devonte for the attack, was weak.[10]

Moreover, while there were some internal inconsistencies in the testimony of the three eyewitnesses, as well as inconsistencies between their testimony, all three generally described the incident in the same way. According to all three witnesses, defendant, Devonte, Aiana, Devon, and Alma were in Alma's car. Devonte was in the front passenger seat and defendant was in the back seat. As defendant was getting ready to leave, he cut Devonte's throat. After the attack, defendant went to his vehicle and left.

Finally, defense counsel was allowed to ask Devonte whether he told medical professionals that he did not know his attacker, and Devonte denied making the statement.

Given this evidence, it is not reasonably probable there would have been a more favorable result for defendant had one medical record stating that Devonte was attacked "by an unknown individual" and that "[p]atient states that they do not know the assailant" been introduced.

As to defendant's argument that the fact several jurors initially believed he was innocent shows he was prejudiced by defense counsel's performance, even assuming the evidence is properly before us,[11] defendant has not cited any law, nor are we are of any,

---

**10** We also note that, while all three eyewitnesses testified that defendant was an acquaintance and not a friend, there is no evidence in the record suggesting that they had a motive for framing defendant. There is also no evidence that defendant was somewhere else at the time of the attack.

**11** The only evidence provided was a declaration from defense counsel that "[f]ive or six jurors remained in the hallway to speak with both counsel," and that "[w]hen deliberations began, two or three jurors were adamant that they believed [defendant] was innocent and they would not convict him." This is hearsay.

suggesting that a juror's initial thoughts have any relevance to the prejudice analysis. Moreover, there is nothing in the record suggesting that, after deliberating and reviewing the evidence, the jury reached an impasse or otherwise considered this a close case. (See, e.g., *People v. McDaniel* (2019) 38 Cal.App.5th 986, 1009 [finding prejudice where "the record reveal[ed] that the jury found the case to be a close one and struggled to reach guilty verdicts on all counts"].) Accordingly, even assuming that several jurors thought defendant was innocent when deliberations began, this fact alone has no bearing on our analysis.

### III. Denying Defendant's Motions for Release of Jury Identifying Information Was Not an Abuse of Discretion

#### A. *Background on Defendant's First Motion for Release of Jury Identifying Information*

On July 27, 2022, defendant filed his first motion for release of jury identifying information, along with a declaration from defense counsel. The prosecutor opposed the motion.

According to the declaration of defense counsel, after the verdict was read, five to six jurors remained in the hallway and spoke with defense counsel and the prosecutor. Those jurors told counsel that when deliberations began, two or three were "adamant" that defendant was innocent. The jurors who remained also told counsel that the jurors who thought defendant was innocent believed there was another person at the park when the incident occurred and that the witnesses hid his or her identity. One of the jurors who remained, Juror No. 8, stated that he was originally going to vote not guilty, but was convinced to change his vote. "The foreperson essentially said, 'We got [those jurors] to admit that that didn't matter.' The foreperson also described that during the deliberations, she would identify one fact, such as whether the window was down or up, and go around the room and get each juror to 'admit' that that fact was proven to them." Moreover,

"when the jury walked out to read the verdict … Juror [No.] 9 looked dejected and beaten down, just from her body language."

Further, according to defense counsel, the jury requested readback of testimony from Devonte, Alma, Stewart, and Aiana while they were deliberating. Based on the timeline of the deliberations and the readbacks, "it appears that the jury was not allowed to deliberate for more than thirty minutes at any one session before the foreperson, who was adamantly on the side of guilt, would essentially end discussions by making those jurors listen to the read back she selected." Overall, the jury was "probably only allowed to engage in discussions with each other for about two hours before rendering a verdict."

Defendant argued that "[t]he foreperson led the discussion, controlled the notes, controlled the readback, and ultimately controlled the verdict." She "used un[due] influence on the jurors who wished to vote not guilty, and the hold out jurors were coerced into 'admitting' they were 'wrong,' as opposed to being allowed to discuss the evidence as they saw it and potentially sway other jurors in their favor."

Defendant asked the trial court to release jury identifying information so that he could conduct an investigation related to a motion for a new trial based on this misconduct.

On August 10, 2022, the trial court held a hearing on the motion. After reviewing the briefs and hearing arguments from the parties, the trial court denied the motion.

As to Juror No. 8, who initially believed defendant was not guilty, the trial court "did not detect any facts to support that there was any impropriety that took place in the course of Juror [No.] 8 changing his mind. In other words, the best [the court could] tell Juror [No.] 8 didn't indicate that there was any undue influence or excessive coercion or pressure or anything that was really impermissible at all in term[s] of changing his mind. He just said he changed his mind, was convinced to change his mind. Not that there was any type of impropriety. Of course jurors changing their minds is part of the process. In fact, we tell jurors all the time in the jury instructions do not hesitate to change your mind

21.

if you're convinced you're wrong but do not change your mind just because of pressure." Additionally, based on Juror No. 8's statements, there was no indication that the other jurors who initially believed defendant was not guilty changed their minds because of inappropriate conduct. The trial court also held that even if it were "to go down that avenue," it would "very clearly [be] an invasion of the mental processes of the jurors," which is "not an appropriate basis for exploration and inquiry."

As to defense counsel's assertion that Juror No. 9 looked "dejected and beaten down," the trial court found that it was too speculative to support the release of juror information.

Finally, the trial court noted that if any juror felt coerced to vote a certain way, that juror could have spoken to the bailiff or counsel after trial. Additionally, all the jurors were polled in open court as to whether they supported the verdict, and they all supported it.

The trial court concluded:

> "Ultimately I do not feel that there was sufficient factual basis for me to conclude or have a reasonable belief that jury misconduct occurred. There's no reasonable factual basis for me to reach that conclusion and when I look at the reasons for the release—potential release of information, it just doesn't meet the burden. On top of that I also look at the public policy. There's strong public policy in favor of protecting the personal identifying information of the jurors and then it becomes very clear to me that the motion should be denied. Obviously the jurors are volunteers essentially and we really have to protect their privacy, respect their deliberations, respect their efforts and to have them be contacted after their service to be questioned about the process it can happen honestly but it needs to have a good reason to really invade their privacy like that and the reasons are not sufficient so for that reason I will deny the motion."

### B.     *Background on Defendant's Second Motion for Release of Jury Identifying Information*

On October 26, 2022, defendant filed a motion for new trial through which defendant made a second motion for release of jury identifying information. The motion was based on statements from defendant's brother, defendant's wife, defendant's mother,

22.

and defendant's father.[12] The statements made were not identical, and there were inconsistencies as to whether the prosecutor or defendant's wife initiated the conversation. However, all four stated that, in the hallway outside of the courtroom, near the end of the trial, the prosecutor commented on the strength of the evidence he presented. The prosecutor stated something along the lines of "It's 4 against 1[,] [e]asy win," "I've got 4 witnesses and it's common sense," or "It's already done." Once the prosecutor realized he was talking to defendant's family, he left. Defendant's wife stated that at least one juror heard the prosecutor's comments.

Defendant argued that the prosecutor's statements violated a court order not to discuss the case where jurors could hear. Additionally, the statements directly contradicted the instructions provided to the jury. The prosecutor counted the number of witnesses on each side, which the jury was instructed not to do. The prosecutor commented on the fact that defendant did not testify, which the jury was instructed not to consider. Finally, the prosecutor made the comment before the defense presented any evidence, while the jury was instructed to not form an opinion about the case "until the evidence has been concluded."

Accordingly, defendant asked the trial court for juror identifying information so that he could "further investigate the misconduct." The prosecutor opposed the motion.

On November 9, 2022, the trial court held a hearing on the motion. Defendant's wife testified at the hearing that she was sitting in the hallway outside of the courtroom with her in-laws. One juror was standing close to her and about 10 other jurors were also in the hallway. The prosecutor walked out of the courtroom and asked defendant's family, "What do you think?" Defendant's wife asked, "What do you mean?" The prosecutor stated, "It's only common sense." Defendant's wife replied, "Everybody wasn't born with common sense." The prosecutor also stated that he had four witnesses.

---

[12] While identified as defendant's father, it appears the statement was provided by defendant's second stepfather.

The prosecutor stopped talking to defendant's wife and her in-laws after he realized they "were for [defendant]." This occurred after the trial had ended.

The trial court denied the motion. The trial court found that only one witness, defendant's wife, "identified that the jurors were potentially present." Not one other witness stated that jurors were present. In fact, "even one of the defense['s] own witnesses said there were no other people around." And even if a juror was present, nothing the prosecutor said "was inadmissible." Instead, it was "the same type of thing" as what the prosecutor argued in his closing argument. Moreover, the jurors were instructed to disregard anything they saw or heard outside of the courtroom, "even if it [was] said or done by one of the parties or attorneys."

### C.    *Applicable Law*

In a criminal proceeding, the trial court's record of the trial jurors' "personal juror identifying information" must be sealed "[u]pon the recording of [the] jury's verdict." (Code Civ. Proc., § 237, subd. (a)(2).) Pursuant to Code of Civil Procedure section 206, subdivision (g), "a defendant or defendant's counsel may, following the recording of a jury's verdict in a criminal proceeding, petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." "The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information." (Code Civ. Proc., § 237, subd. (b).) If a defendant makes "a prima facie showing of good cause," the court shall set a hearing.[13] (*Ibid.*)

" '[A] prima facie showing refers to those facts demonstrated by admissible evidence, which would sustain a favorable decision if the evidence submitted by the

---

[13]     The trial court need not set a hearing if there is a "compelling interest against disclosure" (Code Civ. Proc., § 237, subd. (b)), but no one argues there is such an interest here.

24.

movant is credited." (*People v. Johnson* (2015) 242 Cal.App.4th 1155, 1164, italics omitted.)

"Good cause, in the context of a petition for disclosure to support a motion for a new trial based on juror misconduct, requires 'a sufficient showing to support a reasonable belief that jury misconduct occurred ….' " (*People v. Cook* (2015) 236 Cal.App.4th 341, 345.) "Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported." (*Id.* at p. 346.) The misconduct alleged must be " 'of such a character as is likely to have influenced the verdict improperly.' " (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322.)

### D.     Standard of Review

A trial court's denial of a motion for release of jury identifying information is reviewed for abuse of discretion. (*People v. Munoz* (2019) 31 Cal.App.5th 143, 165.)

### E.     Analysis

As to defendant's first motion for release of jury identifying information, defendant argues that "counsel's declaration showed a basis to investigate whether the foreperson exercised coercive undue influence over the jurors who wanted to vote not guilty. The trial court failed to address the foreperson's coercive method of wearing down the other jurors by putting them on the spot instead of engaging in discussion, and the court failed to address defense counsel's assertion that the foreperson's repeated readbacks cut off productive deliberation."

Defendant's argument is without merit.

It is true the language the foreperson allegedly used, that she "got" jurors to admit certain things, is strong. However, the trial court instructed the foreperson to "see to it that [the] discussions are carried on in an organized way and that everyone has a fair chance to be heard," and it appears that this is exactly what the foreperson did.

There is no evidence that the foreperson attempted to "wear[] down the other jurors by putting them on the spot instead of engaging in discussion." Instead, it appears

25.

the foreperson guided the discussions and made sure that each juror gave their views on each fact. There is nothing before us suggesting the process was intended to be, or inherently was, coercive. There is also nothing before us suggesting that in controlling the "pace" of the deliberations the foreperson "cut off productive deliberation," as argued by defendant. In fact, according to defense counsel's declaration, one of the jurors who initially thought defendant was innocent stated that "he had been convinced to change his vote." Nothing in this statement suggests that the juror witnessed coercive conduct.

Thus, the evidence presented by defendant, even if credited, does not support a reasonable belief that jury misconduct occurred, and the trial court did not abuse its discretion in denying defendant's first motion for juror identifying information.

As to the second motion, defendant argues that the trial court weighed the evidence, which was error at the prima facie stage. Defendant further argues that the prosecutor's comment(s) "may have improperly impacted at least one juror's consideration of the evidence at trial at a time when the jurors were supposed to presume [defendant] innocent and to keep an open mind going into the defense presentation of its case."

This argument is also without merit. Defendant's second motion focused almost entirely on statements made by the prosecutor. Even crediting the testimony that a juror heard the prosecutor's comments, there is no evidence in the record suggesting that even one juror considered the comments during deliberation or otherwise used the statements in an improper way. Moreover, as the trial court pointed out, "the jurors [were] specifically instructed the only evidence to consider is what is presented … in court and to specifically disregard anything [they] see or hear outside of the courtroom even if it is said or done by one of the parties or attorneys." We presume jurors understand and follow a court's instructions (*People v. Sanchez* (2001) 26 Cal.4th 834, 852), and we see no reason to deviate from that presumption here.

26.

As the allegations of juror misconduct are speculative and unsupported, the trial court did not abuse its discretion in denying defendant's second motion for juror identifying information.

## IV. The Trial Court Erred When It Denied Defendant's Motion to Strike All Enhancements

### A. Additional Background

On October 28, 2022, defendant filed a sentencing motion. Among other things, defendant asked the trial court to strike all enhancements pursuant to section 1385 and to impose the lower term on count 2 pursuant to section 1170. Defendant's sentencing motion included letters of support from his friends and family.

As to the request to strike the enhancements, defendant argued that three mitigating circumstances applied: multiple enhancements were alleged (§ 1385, subd. (c)(2)(B)), applying the enhancements could result in a sentence over 20 years (§ 1385, subd. (c)(2)(C)), and "[t]he current offense [was] connected to prior victimization or childhood trauma" (§ 1385, subd. (c)(2)(E)). According to defendant, his "father was murdered before [defendant's] first birthday. His stepfather of four years was abusive, before he was murdered as well. By the age of six, [defendant] had lost two father figures and experienced abuse himself."

Defendant's request for imposition of the lower term on count 2 pursuant to section 1170 was also based on the alleged childhood trauma.

Defendant's sentencing hearing was held on November 9, 2022. At the hearing, the trial court denied defendant's request to strike all enhancements because this case was "very serious" and because defendant "has a very long and extensive criminal history … that … is full of very serious crimes."

The trial court also denied defendant's request for imposition of the lower term on count 2, stating:

"To start that off with I do not believe that the defense has established … that the defendant here has suffered psychological physical childhood trauma within the meaning of the law and so there's been some indications of abuse, neglect, and so forth but that's come out in a very kind of conclusory way.  Lots of the statements submitted by the defense indicate that the defendant in this case … had, you know, a tough childhood or something like that.  But quite frankly from the tone of the letters and the support it actually seems like he has a very supportive family environment …. A lot of family members who seem to be doing fine in society and the general references were to him choosing a life of drugs and/or him making bad decisions and things of that nature.  So there were no specifics that I was able to discern in any of those witness statements or any other evidence—doctors letters or counseling or anything to indicate that he suffered the type of trauma, abuse, neglect, exploitation, et cetera that falls within that.  So I don't find that to be a case where there's the super mitigant under [section] 1170 or [section] 1385 …."

The trial court next addressed the mitigating and aggravating factors.  When doing so, the trial court noted it previously found true "that the defendant has engaged in violent conduct that indicates a serious danger to society.  That is a very important [factor] and weighs in on my decision on which term to go with but also in denying the defense motion to strike that prior and dismiss the enhancements.  I do find that given the conduct in this case as well as his prior conduct it does indicate a very serious threat to public safety …."  Ultimately, the court found that the mitigating and aggravating factors "essentially weigh each other out" and sentenced defendant to the middle term on count 2.[14]

### B.    Applicable Law

On January 1, 2022, Senate Bill No. 81 (2021-2022 Reg. Sess.) (Senate Bill 81) went into effect (Stats. 2021, ch. 721, § 1), amending section 1385 "to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice."  (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.)

---

[14]    The sentence on this count was stayed pursuant to section 654.

Section 1385, subdivision (c)(1), provides:  "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute."  Section 1385, subdivision (c)(2), provides:  "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present.  Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.  'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."

## C.     *Standard of Review*

We review issues of statutory construction de novo.  (*People v. Gonzales* (2018) 6 Cal.5th 44, 49.)  Our goal is to determine the legislative intent of the statute.  (*People v. Johnson* (2022) 79 Cal.App.5th 1093, 1108.)  "Because the statutory language is generally the most reliable indicator of that intent, we look first at the words themselves, giving them their usual and ordinary meaning."  (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1040, overruled on other grounds in *Facebook, Inc. v. Superior Court* (*Touchstone*) (2020) 10 Cal.5th 329, 345, fn. 6.)  When the statutory language is unambiguous, its plain meaning controls.  (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)  We also "generally must 'accord[] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose,' and [the Supreme Court] ha[s] warned that '[a] construction making some words surplusage is to be avoided.' "  (*People v. Valencia* (2017) 3 Cal.5th 347, 357.)  Where the language supports more than one reasonable construction, we may look to extrinsic aids, including the legislative history, for additional guidance.  (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1105–1106.)

A trial court's decision not to dismiss an enhancement pursuant to section 1385, subdivision (c), is reviewed for abuse of discretion.  (*People v. Mendoza* (2023)

88 Cal.App.5th 287, 298.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) Additionally, "an abuse of discretion arises if the trial court based its decision on impermissible factors [citation] or on an incorrect legal standard." (*People v. Knoller* (2007) 41 Cal.4th 139, 156; see also *Conservatorship of Bower* (2016) 247 Cal.App.4th 495, 506.) Finally, "[w]hen being sentenced, a defendant is entitled to decisions made by a court exercising informed discretion. [Citation.] A court acting while unaware of the scope of its discretion is understood to have abused it." (*People v. Tirado* (2022) 12 Cal.5th 688, 694.)

### D. Analysis

Defendant argues that the trial court erred in its application of section 1385, subdivision (c)(2). Specifically, defendant argues that "[t]he court's comment that [defendant's] conduct indicated a serious danger to society was an explanation of the 'conduct in this case as well as his prior conduct'; it did not indicate that there would be a future threat to public safety if the enhancement was dismissed." The People argue that "[p]art of this argument has been forfeited," the trial court did find that dismissal of the enhancement would endanger public safety, and any error was harmless.

To begin, even if this argument was forfeited, we exercise our discretion to address it. (*People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6 ["An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party"].)

As to the merits, we agree with defendant that the trial court erred. The court's analysis focused solely on defendant's past conduct, and the court concluded that that conduct indicated a "very serious threat to public safety." However, in the context of section 1385, the question is not whether a defendant's past conduct indicates that he or she currently poses a threat to public safety, but whether *striking the enhancement* would likely endanger public safety. (§ 1385, subd. (c)(2).) "Although the current

30.

dangerousness of the defendant is an appropriate factor to consider, as it will have some bearing on whether dismissing the enhancement would endanger the public, a crucial part of the inquiry is how the dismissal of the enhancement will impact the length of the defendant's sentence." (*People v. Gonzalez* (2024) 103 Cal.App.5th 215, 228.)

The People argue that "[t]his is a hyper-technical, hair-splitting distinction." It is true that in some cases this distinction may make little difference to the outcome. As discussed above, trial courts may appropriately rely on a defendant's past conduct when determining whether striking an enhancement would likely endanger public safety. (See *People v. Mendoza* (2023) 88 Cal.App.5th 287, 299 [finding that a trial court did not abuse its discretion when it determined that dismissal of the enhancement would likely endanger public safety in part because the defendant's past conduct was " 'incredibly harmful and dangerous' "].)

However, the distinction is important, especially in cases where the defendant is sentenced to a life term. In this case, even if the trial court struck all enhancements, defendant would still be serving a life term with a minimum parole eligibility date of 14 years. And, "an inquiry into whether public safety will be endangered by the dismissal of an enhancement for a defendant serving a lengthy indeterminate sentence should … take into account that the defendant's release from prison is contingent on review by the Board of Parole Hearings (and for murder convictions, by the Governor), who will have the opportunity to assess the defendant's dangerousness at that time. [Citations.] That future review will act as a safety valve against a release that would endanger the public and is relevant to a trial court's analysis of whether the dismissal of an enhancement imposed on a defendant serving an indeterminate prison term will endanger public safety." (*People v. Gonzalez, supra*, 103 Cal.App.5th at p. 228, fn. omitted.)

Finally, while " '[t]he trial court [was] not required to state reasons for declining to exercise its discretion under section 1385' [citations], and 'is presumed to have

considered all of the relevant factors in the absence of an affirmative record to the contrary' " (*People v. Brugman* (2021) 62 Cal.App.5th 608, 637), here, the court provided a detailed analysis. And nothing in that analysis suggests that it considered the impact striking the enhancements would have on defendant's sentence.

Accordingly, the trial court erred in its application of section 1385. Moreover, even applying the *Watson* harmless error standard, the error was not harmless. Under this standard, reversal is not required unless it is reasonably probable that defendant would have obtained a more favorable result had the error not occurred. (*Watson*, *supra*, 46 Cal.2d at p. 836.) Here, had the court considered the length of defendant's sentence and that defendant's release from prison is contingent on review by the Board of Parole Hearings when ruling on defendant's motion to strike all enhancements, it is reasonably probable that the trial court would have dismissed at least one of the enhancements.

We next turn to defendant's argument that we should strike both enhancements. According to defendant, "[t]here is no evidence in the record of this case that striking the enhancement at issue could possibly cause danger to the public because even if the enhancement were to be struck, [defendant] would still be serving life in prison." Defendant also asserts the trial court's finding that defendant's "prior performance on parole and [postrelease community supervision] was satisfactory in past cases" shows that defendant "would not be a threat to public safety upon release."

We disagree with defendant. As discussed above, defendant's past conduct is an appropriate consideration when determining whether striking an enhancement would likely endanger public safety. Nothing in the text of section 1385 suggests that evidence of such conduct cannot support a future dangerousness finding when defendant is serving a life sentence, and defendant cites to no authority in support of this argument.

Moreover, the trial court found that "defendant's prior performance on parole and post-release community supervision was satisfactory at least on *some* of those priors" (italics added). While this may be a factor for the trial court to consider on remand, this

32.

finding does not demonstrate, nor did the trial court find, that defendant "would not be a threat to public safety upon release."

Accordingly, we will remand the matter for a full resentencing at which the trial court shall apply the appropriate standard in the first instance.[15] (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) While we are remanding the matter, we take no position on whether the trial court should or should not strike any enhancements.[16]

## V. Defendant's Cumulative Errors Argument Fails

Finally, defendant argues that even if reversal is not required by any error standing alone, "the combination of erroneously excluded evidence, the insufficient evidence of premeditation and deliberation, and multiple instances of defense counsel's deficient performance combined to render [defendant's] trial fundamentally unfair in violation of the due process clause of the Fourteenth Amendment."

This argument fails. " 'We have found no error, and where we assumed error, we have found no prejudice. Nor do we discern cumulative prejudice.' " (*People v. Duong* (2020) 10 Cal.5th 36, 75; *People v. Westerfield* (2019) 6 Cal.5th 632, 728.)

---

[15] At oral argument, the parties discussed *People v. Walker* (2024) 16 Cal.5th 1024, which our Supreme Court recently decided. In this case, the Supreme Court held that "if the court does not conclude that dismissal would endanger public safety, then mitigating circumstances strongly favor dismissing the enhancement. But ultimately, the court must determine whether dismissal is in furtherance of justice. This means that, absent a danger to public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' " (*Id*. at p. 1036.)

*Walker* does not address the standard for determining whether dismissal of an enhancement would endanger public safety and is thus not relevant to the analysis herein. However, on remand, if the trial court finds that dismissing enhancement(s) would not endanger public safety, it shall apply the holding in *Walker*.

[16] As we are remanding the matter for a full resentencing, we do not address defendant's other claims of sentencing error.

## DISPOSITION

Defendant's sentence is vacated and the matter is remanded to the trial court to conduct a full resentencing consistent with this opinion.   In all other respects, the judgment is affirmed.


DE SANTOS, J.

WE CONCUR:


FRANSON, Acting P. J.


MEEHAN, J.